IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ROGER E. MARTIN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 11-034-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Roger E. Martin is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[1]

## Procedural History

Mr. Martin filed an application for benefits in November, 2006, alleging disability beginning on July 14, 2003. (Tr. 130). His application was denied initially and on reconsideration. After holding a hearing, ALJ Lawrence D. Wheeler denied the application for benefits in a decision dated October 22, 2009. (Tr. 10-21). Plaintiff's request for review was denied by the Appeals Council in November, 2010, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1]This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 17.

**Issues Raised by Plaintiff**

Plaintiff argues that the ALJ erred in the following respects:

1. He erred in his consideration of the opinions of the state agency consultants.

2. He should have given greater weight to the opinions of plaintiff's treating psychiatrist, Dr. Qureshi.

3. He failed to perform a proper analysis of plaintiff's credibility.

4. He did not consider the effects of obesity.

**Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  It must be determined:  (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Mr. Martin is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).  This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richard v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, **Parker v. Astrue, 597 F.3d 920, 921**

(7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Wheeler followed the five-step analytical framework described above.  He determined that Mr. Martin had not been engaged in substantial gainful activity since the alleged onset date.  He noted that a prior application for benefits was denied on February 18, 2006.  The ALJ found that plaintiff has severe impairments of degenerative disc disease, carpal tunnel syndrome, chronic kidney disease, obesity, adjustment disorder with mixed emotional features, and cannabis abuse by history.  He further determined that these impairments do not meet or equal a listed impairment.  The ALJ found that Mr. Martin has the residual functional capacity to perform a limited range of work at the light exertional level.  The VE testified that he could perform jobs which exist in significant numbers in the national and local economy.  The ALJ accepted this testimony, and found that he is not disabled.  (Tr. 10-21).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.

**1.     Agency Forms**

Mr. Martin was born in 1969, and was 34 years old when he allegedly became disabled. (Tr. 142).  He was insured for DIB through December 31, 2008.  (Tr. 143).  A prior application for benefits was denied on February 18, 2006.  (Tr. 143).

In a Work History Report, Mr. Martin indicated that he was a service operator for heavy equipment from 1999 through July, 2003.  Before that, he drove a delivery truck for various employers.  (Tr. 168).

4

**2.     Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on September 21, 2009. (Tr. 24). He was 40 years old at the time of the hearing. (Tr. 35). He was six feet tall and weighted about 320 pounds. (Tr. 37).

Mr. Martin testified that he last worked in 2003. (Tr. 27). He serviced heavy equipment. (Tr. 28). He stopped working due to a back injury, for which he filed a workers compensation claim for a total of $250,000.00. (Tr. 29-30).

Plaintiff testified that he could not work due to his back, problems with his feet, and mental problems. He said that his feet "are deteriorating" and that the doctors "want to take a nerve out of there." (Tr. 35-36).

When asked whether his current therapy helped his back, he said no. (Tr. 43-44). He testified that Fentanyl patches helped, but that he was "getting addicted" to them. (Tr. 44).

Mr. Martin lived with his wife and children, who were then 13 and 17. He testified that he passed the day by watching television and laying down. He said that his medication made him sleepy. He does not cut the grass. He walks around the yard a little. (Tr. 45-47). He lays down to relieve the pain in his back and legs. He estimated that he spends at least 12 hours out of the day laying down. (Tr. 47-48). He said that his pain is a level of 7 on a scale of 1 to 10, just sitting in a chair, and it gets worse with any activity. (Tr. 48-49).

Mr. Martin testified that "all" of his pain medications make him sleepy. (Tr. 49). When the ALJ pointed out a contradictory note in a medical record, he changed his testimony to say that "some" of his medicines make him sleepy. (Tr. 50). He specified that Valium, Duragesic patches and Seroquel make him sleepy, and he takes them a regular basis. (Tr. 51).

Plaintiff estimated that he could walk 40 to 45 steps before he would have to sit down

due to pain. No doctor has told him to use a cane, crutch or walker. (Tr. 51-52). He has pain in his back and hips, and it shoots down his legs "[a]ll the time." (Tr. 52). His legs become red and swollen if he stands for more than 20 or 30 minutes. (Tr. 53). He has carpal tunnel syndrome in both wrists, and has had surgery on the left. (Tr. 53). He has had 3 back surgeries, including a discectomy and 2 fusions. (Tr. 55).

His wife worked at Kroger. They had insurance through her job, so he was able to get health care. (Tr. 47).

With regard to mental problems, Mr. Martin testified that he has been diagnosed with depression and bipolar disorder. He has panic attacks which are triggered by being nervous. (Tr. 56-57). He has difficulty sleeping due to sleep apnea. (Tr. 57-58). He testified that he could concentrate for only 5 minutes at a time. (Tr. 60).

Ronald Hatakeyama, PhD, testified as a vocational expert.[3] The ALJ asked him to assume a person who could do the exertional requirements of light work, limited to no climbing, no ladders, ropes or scaffolds, no more than occasional ramps and stairs, no more than occasional kneeling, crouching, stooping and crawling, only simple one-to-three-step tasks and no more than occasional contact with others. The VE testified that this person could not do plaintiff's past work, but could do the jobs of assembler of small products and office helper, which exist in significant numbers. (Tr. 62-63).

The VE further testified that there would be no jobs the person could do if he were also limited to only occasional reaching with both hands. (Tr. 63-64). In addition, an ability to concentrate for less than 15 minutes would preclude all employment. (Tr. 66).

---

[3]The VE's name is incorrectly spelled as "Tokyoma" in the transcript of the hearing. His c.v. is at Tr. 122.

3.     **Medical Records**

The alleged date of disability is July 14, 2003.  However, plaintiff's prior application for benefits was denied on February 18, 2006.  That decision is res judicata and stands as a finding that he was not disabled as of February 18, 2006.   Thus, while the Court may consider medical evidence which predates February 18, 2006, it must accept the Commissioner's decision that Mr. Martin was not disabled as of that time.  **See,** ***Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998).**

The medical records begin in 2002, when plaintiff was evidently living in Virginia.  He had a hemilaminectomy and discectomy at L3-4 and L4-5 on the right in 2002.  (Tr. 258-260). In July, 2003, he hurt his back at work.  In August, 2003, a lumbar MRI showed multi-level degenerative changes with a disc bulge at L3-4, as well as postoperative changes.  (Tr. 344-345). He had physical therapy.  (Tr. 262-273).

In October, 2003, plaintiff saw Dr. David Waters, a neurosurgeon in Norfolk, Virginia. Dr. Waters ordered a lumbar myelogram.  This study showed disc protrusions at L4-5 and L5-S1, neural foraminal stenosis at L5-S1, and instability and central canal stenosis at L3-4.  Dr. Waters recommended a back brace,  epidural injections and pain medication.  This treatment did not help.  A discogram in January, 2004, showed annular tears at L3-4 and L4-5.  (Tr. 433-438).

Dr. Walters did a lumbar laminectomy with fusion at L3-4 and L4-5 and decompression of the nerve roots from L3 to L5 in July, 2004.  (Tr. 394-396).   In February, 2005, a myelogram showed that fusion had not been achieved at L3-4 or L4-5, and there were degenerative changes at L5-S1 which could affect the L5 or S1 root.  (Tr. 460-461).   In May, 2005, Dr. Walters surgically removed the old hardware from plaintiff's back and redid the fusion with new hardware, along with laminectomy and fusion at L5-S1 and  decompression of the L5-S1 nerve roots.  (Tr. 479-481, 483-485).

In August, 2005, Dr. Walters released Mr. Martin to return to "office work" on a very limited basis. (Tr. 495). In September, 2005, plaintiff complained of pain in his spine and pain running down his legs. On examination, he had good strength and sensation in both legs, with a tendency to give way. X-rays showed good position of the bone graft and hardware. (Tr. 494).

In December, 2005, Dr. Walters noted that Mr. Martin was in the process of settling his workers compensation claim, and that he looked "much better and more relieved." (Tr. 504). X-rays taken that same month showed that his hardware was non-mobile, and Dr. Walters felt his symptoms were due to soft-tissue issues. He recommended a walking program and stretching. (Tr. 503). The workers compensation claim was settled that month for a total of $257,000.00. (Tr. 323-324).

Mr. Martin was seen at Depaul Medical Center in Norfolk, Virginia, on January 12, 2006, for sinusitis. It was noted that he was not taking any medications. On examination, his neck and back were non-tender and he had a normal range of motion in all extremities. His neurological examination was normal. (Tr. 421-423).

On February 23, 2006, plaintiff told Dr. Walters he was having pain in his hips when he walks, and pain in his back. Dr. Walters felt that, in view of his history, he was doing "quite well." He prescribed a small dose of Darvocet, along with Naprosyn and Prozac. He was to return in a month. (Tr. 505). There are no more records from Dr. Walters.

The records do not show much treatment during 2006. Sometime during that year, Mr. Martin moved to Illinois. He was seen by PA Sally Ballard at Franklin Rural Health Clinic in West Frankfort, Illinois, in October, 2006, with complaints of neck pain and numbness in both hands, along with lumbar pain at a level 6. His hand grips were equal and straight leg raising was negative. (Tr. 357). A cervical MRI showed disc degeneration with early disc prolapsed

herniation at C5-6, along with limited narrowing of the neural foramina and central canal. (Tr. 363). PA Ballard prescribed medication and physical therapy. (Tr. 359). He attended 3 therapy sessions in October, 2006. (Tr. 350-354).

Mr. Martin was seen at Synergy Therapeutic Group for an initial evaluation and physical therapy on October 31, 2006. (Tr. 509). He did not return to Synergy for therapy following his initial evaluation. (Tr. 427).

State agency physician Richard Bilinsky, M.D., completed a Physical RFC Assessment on January 2, 2007. He determined that plaintiff could frequently lift 10 pounds, occasionally lift 20 pounds, stand and/or walk 6 out of 8 hours and sit for 6 out of 8 hours. His ability to push and/or pull with upper extremities and operate foot controls was unlimited. He was limited to only occasional postural activities. The only manipulative limitation was in the area of reaching. He was limited to only occasional reaching, including overhead, on both sides due to reduced cervical range of motion. Dr. Bilinsky noted that he weighed 325 pounds. He had good hand grips and negative straight leg raising. (Tr. 510-517).

On February 19, 2007, plaintiff was seen by Dr. Bergandi, an orthopedic specialist. He complained of back and neck pain. The exam of his cervical spine was within normal limits. The doctor noted that his MRI showed only minor bulging at C5-6. His lumbar spine had a well-healed surgical scar. X-rays showed a "well-done" fusion. Straight leg raising was negative. Dr. Bergandi recommended physical therapy and injected his hip as he might have bursitis. (Tr. 522-523). On March 12, 2007, Dr. Bergandi noted that Mr. Martin had been to see a pain management specialist, and his medicines had been changed. The new medications gave him "significant relief" of his low back pain. His low back pain was improving with "current therapy." Nerve conduction studies had shown bilateral carpal tunnel syndrome. The doctor

gave him another hip injection and advised him to continue with physical therapy. (Tr. 556-557).

Pain management specialist Jose Rivera, M.D., evaluated plaintiff on March 8, 2007. He noted that plaintiff was depressed and anxious, with panic attacks. On physical examination, he had cervical tenderness but no spasm. He had a normal range of motion of the cervical spine, arms and shoulders. His grip strength was normal and equal. He also had tenderness without spasm of the lumbar spine. The range of motion of the lumbar spine was reduced in all directions due to pain. Straight leg raising was positive on both sides. Dr. Rivera prescribed medications, including MS Contin (morphine) and Zanaflex. (Tr. 680-692). In April, 2007, he stopped anti-inflammatories because plaintiff had developed kidney disease. On April 24, 2007, he gave plaintiff steroid injections in the cervical and lumbar spines. (Tr. 679). In December, 2008, plaintiff's kidney disease had improved to Stage 2. (Tr. 731-732).

Mr. Martin was seen by Dr. Steven Young, who practiced with Dr. Bergandi, for his carpal tunnel syndrome in April, 2007. Mr. Martin said that he had been diagnosed with kidney disease and had been told to refrain from taking anti-inflammatory medications. (Tr. 627-628). Dr. Young did surgery on the left wrist on May 4, 2007. (Tr. 628-629).

Harry J. Deppe, PhD, did a consultative psychological exam on July 16, 2007. (Tr. 693). He reported that plaintiff had no formal thought disorders or delusional thought processes, and that he denied hallucinations. He had no difficulty staying on task. His memory for recent and remote events was good, and his immediate memory skills were fair. His judgment and insight were adequate. Dr. Deppe concluded that Mr. Martin had intact ability to understand and follow simple instructions, maintain attention required to perform simple, repetitive tasks and to withstand the stress and pressure of day-to-day work activity. He diagnosed adjustment disorder

with mixed emotional features.

A state agency psychologist completed a Mental Residual Functional Capacity Assessment on July 26, 2007.  She indicated that Mr. Martin was not significantly limited in most areas.  She assess moderate limitation in ability to understand and carry out detailed instructions, maintain attention for extended periods, interact with the public, get along with coworkers, and accept instructions and criticism from supervisors.  She concluded that Mr. Martin was able to perform simple one-two step work tasks.  (Tr. 717-720).

State agency physician Calixto Aquino, M.D., performed a Physical RFC Assessment on August 6, 2007.  He determined that plaintiff could  frequently lift 10 pounds, occasionally lift 20 pounds, stand and/or walk 6 out of 8 hours and sit for 6 out of 8 hours.  His ability to push and/or pull with upper extremities and operate foot controls was unlimited.  He had some postural limitations, including never using ladders, ropes or scaffolds.  The doctor noted his history of carpal tunnel syndrome, but found he had no manipulative limitations.  He had no visual,  communicative or environmental limitations.  In the Comments section, Dr. Aquino noted that plaintiff had a minor disc bulge in his cervical spine, but that the range of motion of the neck and arms was within normal limits.  (Tr. 721-728).

In June, 2008, Mr. Martin began receiving mental health treatment from Dr. Qureshi's office, Southern Illinois Psychiatry, LLC.  He was seen there by Advanced Practice  Nurse (APN) Auna Searcy between June, 2008, and June, 2009.  (Tr. 797-812).  APN Searcy diagnosed obsessive compulsive disorder and bipolar disorder, and prescribed a number of medications, including Valium and Lexapro.  In her mental status examinations, she consistently assessed his thought content and thought processes as unremarkable,  and assessed his concentration, attention, insight, intellect and judgment as normal.

11

On September 17, 2009, Dr. Qureshi completed a form entitled Medical Source Statement of Ability to Do Work-Related Activities (Mental).  On this form, Dr. Qureshi checked the box for "marked" limitation in every function assessed, including ability to carry out simple instructions and to make judgments on simple decisions.  He also stated that plaintiff was not able to concentrate.  (Tr. 861-863).

## Analysis

Plaintiff's first two points address the ALJ's weighing of the medical opinions.  He first argues that the ALJ erred in weighing the opinions of the state agency consultants.

Two state agency consultants reviewed the records and assessed plaintiff's physical RFC.  Dr. Bilinsky's assessment was in January, 2007, and  Dr. Aquino's assessment was in August, 2007.  Plaintiff argues that the ALJ erred in that he said he gave "great weight" to the state agency consultants, but he failed to recognize that Dr. Bilinsky assessed limitations in reaching and handling.

"State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  Social Security Ruling 96-6p, at 2.   20 C.F.R. §§ 404.1527(f) and 416.927(f) requires that the ALJ consider the state agency consultants' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians.  While the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision.  ***Id.***

Plaintiff's argument is not very well-developed.  He says that the ALJ failed to "recognize" that Dr. Bilinsky assessed limitations in reaching and handling.  However, this is clearly incorrect; at Tr. 19, the ALJ said that Dr. Bilinsky assessed limitations in reaching and

handling.  Presumably, plaintiff means to argue that the ALJ erred in not accepting Dr. Bilinsky's assessment over that of Dr. Aquino.  However, that argument is a nonstarter.  ALJ Wheeler considered the competing opinions and explained the weight he gave to them, as he was required to do by 20 C.F.R. §§ 404.1527(f) and 416.927(f).

ALJ Wheeler noted that Dr. Bilinsky's opinion was rendered before Dr. Aquino's opinion, and that, in the interim, plaintiff's carpal tunnel syndrome had been treated and he showed "no significant restrictions." (Tr. 19).  ALJ Wheeler also noted that medical records from March, 2007, which was after Dr. Bilinsky's report, indicated that he had "absolutely no pain in his neck or his arms." (Tr. 17).   This is not a case where the ALJ ignored part of a medical opinion which contradicted his decision.  ALJ Wheeler sufficiently explained how he weighed the competing opinions of the state agency consultants.  This Court cannot reweigh the evidence.  ***Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)**.

Plaintiff's second point is that the ALJ erred in not giving greater weight to the opinion of Dr. Qureshi, expressed in his report of  September 17, 2009, that he had "marked" limitations in a number of areas.  Plaintiff argues that Dr. Qureshi was a treating doctor, but does not specifically argue that his opinion should have been given controlling weight.  Rather, he argues that the ALJ was remiss in not explaining his reasons for discounting Dr. Qureshi's assessment.

Again, plaintiff's argument ignores the language of the ALJ's decision.  The ALJ stated that Mr. Martin was seen only by an APN, and not by Dr. Qureshi.  He said that, some two months after plaintiff was last seen by the APN, Dr. Qureshi filled out a form in which he assessed marked limitations in all categories.  The ALJ concluded that "The form was not supported by any medical evidence or record."  (Tr. 19).

An ALJ may properly discount a treating doctor's opinion if it conflicts with the opinion

13

of a consulting physician, it is internally inconsistent, or it is based only on the plaintiff's subjective complaints and not on any objective evidence. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). The ALJ is required to "minimally articulate" his reasons for rejecting the opinion. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

The ALJ's explanation was adequate here. It is clear that Dr. Qureshi's assessment was not supported by the medical records. Plaintiff's only attempt to counter that is to point out that plaintiff's GAF was assessed between 50 and 60. However, he ignores the fact that those assessments were made by APN Searcy, and not by Dr. Qureshi.

Since Dr. Qureshi never actually saw plaintiff, it is arguable that he should not be considered to be a treating doctor at all. In any event, every time APN Searcy assessed Mr. Martin, she indicated that his thought content and thought processes were unremarkable, and his concentration, attention, insight, intellect and judgment were normal. As the ALJ stated, there is no support in APN Searcy's records for the marked limitations assessed by Dr. Qureshi. The ALJ adequately explained his reasons for rejecting Dr. Qureshi's opinions, and those reasons were supported by substantial evidence.

In addition, to the extent that plaintiff argues that the ALJ was bound to accept Dr. Qureshi's opinion as to his RFC, he is mistaken. SSR96-8p instructs that the "RFC assessment must be based on *all* of the relevant evidence in the case record," including medical history, medical signs and laboratory findings, effects of treatment, reports of daily activities, lay evidence, medical source statements, etc. SSR96-8p, at *5 (emphasis in original). Opinions of treating doctors regarding RFC are *not* given any special weight because the issue of RFC is an issue that is reserved to the Commissioner. See, 20 C.F.R. §416.927(e). SSR 96-59 explains:

> However, treating source opinions on issues that are reserved to the Commissioner are

> never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

SSR 96-5p, at *2.

Mr. Martin also takes issue with the determination of his credibility. He argues that the ALJ failed to consider the factors required by SSR96-7p. Again, he is incorrect.

An ALJ's credibility determination is to be overturned only if it is patently wrong. ***Eichstadt v. Astrue***, 534 F.3d 663, 667-668 (7th Cir. 2008), citing ***Jens v. Barnhart***, 347 F.3d 209, 213 (7th Cir. 2003). The credibility determination is to be given deference and should be affirmed if the ALJ articulates specific reasons for his findings that are supported by the record. ***Brindisi v. Barnhart***, 315 F.3d 783, 787 (7th Cir. 2003).

The ALJ determined that plaintiff was not credible because his testimony was inconsistent with the objective medical evidence. He cited to specific notes in the medical records which contradicted plaintiff's testimony. This is a proper consideration, since such discrepancies may suggest that plaintiff is exaggerating his symptoms. ***Getch v. Astrue***, 539 F.3d 473, 483 (7th Cir. 2008). The ALJ found it significant that Mr. Martin had told a doctor that he spent most of his time indoors because he feared that workers compensation was monitoring his activities. (Tr. 16). The ALJ reasonably concluded that this suggests that he was willing to exaggerate his disability for financial gain. Further, the ALJ noted that plaintiff first testified that "all" of his medications caused side effects, which he later admitted was not true, and he testified that therapy "never" improved his back pain, which was clearly contradicted by the medical records. These are all valid considerations. The ALJ's credibility findings are not patently wrong, and he sufficiently articulated reasons which are supported by the record. See,

*Castile v. Astrue*, **617 F.3d 923, 930 (7th Cir. 2010)**, affirming the ALJ's credibility determination where he "thoroughly examined the evidence and clearly articulated his findings."

Lastly, plaintiff argues that the ALJ did not adequately consider his obesity. Notably, plaintiff does not point to any specific limitation that he claims was caused by his obesity. The ALJ was obviously aware that plaintiff was obese and he correctly noted that obesity must be considered in conjunction with his other impairments, pursuant to SSR 02-01p. See, Tr. 13.

The ALJ did not explicitly state that he assessed limitations based on obesity. However, he accepted the postural limitations assessed by Dr. Aquino, and Dr. Aquino said in his RFC report that plaintiff was over 300 pounds. See, Tr. 728. Therefore, consideration of the effects of obesity was factored into the ALJ's decision. *Skarbek v. Barnhart*, **390 F.3d 500, 504 (7th Cir. 2004).**

## Conclusion

After careful review of the record as a whole, the Court finds that the ALJ committed no errors of law, and that the findings of the ALJ are supported by substantial evidence.

The final decision of the Commissioner of Social Security denying the application of Roger E. Martin for Disability Insurance Benefits and Supplemental Security Income is **AFFIRMED.**

**The Clerk of Court is directed to enter judgment in favor of defendant.**

**IT IS SO ORDERED.**

**DATED:  December 5, 2011.**

                               s/ Clifford J. Proud
                               **CLIFFORD J. PROUD**
                               **UNITED STATES MAGISTRATE JUDGE**